# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **JEFFREY B. MOULD** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO.  JKB-13-1305** |
| **NJG FOOD SERVICE INC.,** *et al.* | * | |
| **Defendants** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM</u>

Jeffrey B. Mould ("Plaintiff") brought this suit against NJG Food Service, Inc. ("NJG"), OC Crabbag, LLC ("Crabbag"), Nolen J. Graves, and Albert Levy (collectively "Defendants") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*., the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Labor & Employment §§ 3-401 *et seq*., the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Labor & Employment §§ 3-503 *et seq*., the Internal Revenue Code ("IRC"), 26 U.S.C. § 7434, as well as for the common law torts of conversion and unjust enrichment.  Now pending before the Court are (1) Defendants' cross-motion for summary judgment (ECF No. 104); (2) Plaintiff's motion for partial summary judgment (ECF No. 120); and (3) Defendants' supplemental motion for summary judgment (ECF No. 169).  Also pending before the Court is (4) Defendants' motion to strike (ECF No. 136).  The issues have been briefed and no hearing is required.  Local Rule 105.6.

For the reasons set forth below, Defendants' cross-motion for summary judgment (ECF No. 104) and supplemental motion for summary judgment (ECF No. 169) are GRANTED IN

PART and DENIED IN PART; Plaintiff's motion for partial summary judgment (ECF No. 120) is GRANTED IN PART and DENIED IN PART; and Defendants' motion to strike (ECF No. 136) is GRANTED IN PART and DENIED IN PART.

## I.    FACTUAL BACKGROUND[1]

Plaintiff Mould worked as a server at the Crab Bag, a restaurant in Ocean City, Maryland from February 13, 2011 until he was suspended on June 23, 2013 and ultimately terminated on June 27, 2013.  (ECF No. 104-6, Ex. 3, "Mould Depo."[2] at 13, 31.)  As a server, Plaintiff was paid an hourly wage of $3.63 and an overtime hourly wage of $7.26. (ECF No. 121-6; Mould Depo. at 162.)  Defendant Levy is the general manager of the Crab Bag.  (ECF No. 120-11, Ex. 8, "Levy Depo." at 21.)  Defendant Graves, as the owner, sole-shareholder, and president of NJG Food Service, Inc. (which operated under the "doing business as" designation of the Crab Bag), as well as the sole member of OC Crabbag, LLC, is the sole owner of the Crab Bag restaurant. (ECF No. 104-4, Ex. 1, "Corp. Designee Depo."[3] at 236.)

At the end of each shift, Plaintiff and other servers at the Crab Bag received a "revenue report," which provided servers with "recommended contributions" to a tip pool as part of their daily "revenue report."[4]  (ECF No. 137-6, ¶¶ 17-19.)  Money contributed to the tip pool was then shared with other Crab Bag employees, including cooks, crab steamers, and prep cooks, according to an apportionment formula devised by Defendant Levy.  (Levy Depo, 76-78; Corp. Designee Depo at 24.)

---

[1] Each cross-motion for summary judgment is viewed separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (citation omitted).
[2] Selected passages of Plaintiff Mould's deposition were filed by Defendants as ECF No. 104-6.  Other passages were filed by Plaintiff as ECF No. 120-10.  Hereinafter, citations to either will be referenced as "Mould Depo."
[3] Other excerpts of the corporate designee deposition are filed as ECF No. 137-26.  These will also be designated as "Corp. Designee Depo."
[4] There is a factual dispute between the parties with regard to whether or not these "recommended contributions" were, in fact, mandatory.  (*See, e.g.,* Mould Depo. 150-151.)

Starting in December 2011, Defendant Levy implemented a new policy regulating how servers should report their tips for tax purposes. (*See* ECF No. 120-21.) Under this policy, servers, including Plaintiff, were no longer supposed to report the amount of their tips at the end of their shift. Rather, Defendants approximated employees' tip income as 10% of cash sales (i.e., checks that customers paid with cash) and 100% of tips paid by credit card. (*Id.*) This policy did not specifically take into account tips that servers contributed to the tip pool. (ECF No. 120-4, Ex. 1, "Mould Aff." at ¶ 21.) Further, where a customer left no tip on a credit card sale, the sale was treated as a cash sale, and 10% of the amount was added to the server's total tip income. (*Id.*) As a result of this policy, Plaintiff's income was overstated on his 2012 W-2 tax form. (*Id.* at ¶ 22.)

On May 1, 2012, Plaintiff filed the present lawsuit alleging violations of the Fair Labor Standards Act of 1928 ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Labor & Employment §§ 3-401 *et seq.*, the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann. Labor & Employment §§ 3-503 *et seq.*, and the Internal Revenue Code ("IRC"), 26 U.S.C. § 7434, as well as common law torts of conversion and unjust enrichment. (ECF No. 1.) Subsequently, on June 14, 2013, at a servers' meeting, and in the presence of Defendant Levy, Plaintiff stood up and explained that the restaurant's tip pooling policy was illegal and that management was over-reporting servers' wages to the Internal Revenue Service ("IRS"). (Mould Depo. 139-42.) Plaintiff further explained that he had filed a lawsuit against the restaurant and invited other servers to do the same. (*Id.*)

On June 7, 2013, while watching a live video feed from the restaurant, Defendant Levy witnessed Plaintiff putting his arm around Taylor Roes, a hostess. (Levy Depo. 104-06.)

Defendant Levy felt something about the situation was "not right."  (*Id.*)  Later, Levy talked to Roes who indicated that Plaintiff made her "feel uncomfortable."  (*Id.* at 121.)  On June 23, 2013, Levy called Roes into his office to enquire if there had been any further problems with Plaintiff.  (*Id.* at 128.)  She reported that Plaintiff still behaved in a way that made her feel uncomfortable, in that he touched her lower back and made comments regarding her personal life that she felt were inappropriate.  (ECF No. 104-10.)  At Levy's request, Roes made a written statement to this effect.  (*Id.*)

After this conversation, Defendant Levy suspended Plaintiff and began asking other employees about Plaintiff's behavior.  (Levy Depo. at 127.)  As part of his investigation, Defendant Levy collected statements from a number of other employees who also noted Plaintiff's inappropriate workplace behavior.  (ECF Nos. 104-11, -12, -13, -14, -15.)  On June 27, 2013, Defendant Levy terminated Mould.  (Mould Depo. 13, 31.)

On September 4, 2013, with leave of Court (ECF No. 26), Plaintiff filed an amended complaint, which included a count of retaliation in violation of the FLSA (Count X).  (ECF No. 33.)

Additional relevant facts will be addressed later in the opinion.

## II.    STANDARD FOR SUMMARY JUDGMENT

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial.  Fed. R. Civ. P. 56(e)(2).  To carry these respective burdens, each party must support its assertions by citing specific evidence from the record.  Fed. R. Civ. P. 56(c)(1)(A).

The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III.   ANALYSIS

### A.  Defendants' motion to strike inadmissible evidence (ECF No. 136)

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  As the Advisory Committee notes to the 2010 amendments mention, "[t]he objection functions much as an objection at trial, adjusted for the pretrial setting. . . .  There is no need to make a separate motion to strike. . . ." Fed. R. Civ. P. 56 Advisory Committee notes.  Pursuant to this rule, Defendants have objected to the admissibility of evidence submitted by Plaintiff Mould as part of his opposition to Defendants' motion for summary judgment. (ECF No. 136.)

Rather than rule on all of Defendants' objections at the onset, the Court will consider the admissibility of material cited by Plaintiff if and when that material becomes relevant to the Court's adjudication of this matter.

The Court will make one exception to this procedure with regard to Plaintiff's exhibit 25 (ECF No. 121-4), which contains "true and correct copies of photographs [Plaintiff] obtained from Facebook and Instagram."  (Mould Aff. ¶ 2.)  While Plaintiff provides that these pictures are "true and correct copies of photographs that [he] viewed on Facebook and Instagram," such a statement is insufficient to authenticate the photographs as substantially correct representations of the behavior they purport to represent. Further, it does not provide when such behavior

occurred.   The Court shall therefore disregard the pictures in Exhibit 25 as inadmissible evidence.

**B. Plaintiff and Defendants' respective motions for summary judgment (ECF Nos. 104, 120, 169)**

    **1. Counts I and IV (FLSA violations--Minimum wage and overtime)**

Plaintiff's claim in Counts I and IV is that Defendants failed to pay him the minimum wage and the minimum overtime rate for hours worked in excess of forty in any given week required by the FLSA. 29 U.S.C. §§ 206(a), 207(a); 215(a)(2).  Specifically, the issue here turns on whether Defendants were entitled to take a "tip credit" to satisfy these minimum wage and overtime rate requirements.  29 U.S.C. § 203(m); *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 893 (D. Md. 2011) ("Tipped employees . . . are required to receive at least the minimum wage, but their employers are permitted to pay a direct wage of $2.13 per hour and then take a 'tip credit' to meet the $7.25 per hour minimum wage requirement.")

Section 203(m) provides that an employer may not take a tip credit with regard to an employee's wages unless (1) "such employee has been informed by the employer of the provisions of this subsection" and (2) "all tips received by such employee have been retained by the employee, except that the subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." § 203(m); *Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 680-81 (D. Md. 2012).  These two requirements are "strictly construed."  *Id.*; *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011) (quoting *Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002)).

The Court begins by turning to the first requirement, the notice requirement.  Here, Defendants assert that "there is no dispute of fact that Mould was informed by The Crab Bag that

The Crab Bag was taking a tip credit against his wages." (ECF No. 104-1 at 40.)  To support this assertion, Defendants rely on a "review of Mould's paychecks." (*Id.*)  Specifically, they offer that Plaintiff was aware that, as a tipped employee, he received an hourly wage of $3.63/hour (and an overtime rate of $7.26/hour) and that this rate was less than the rate paid to non-tipped employees, which varied between $7.25/hour and $9/hour. (Mould Dep. at 147, 169, 171.) Further, Defendants argue that Plaintiff, like all servers, knew that tips constituted part of their income for tax purposes.  (ECF No. 104-1 at 41; ECF No. 104-18.)   However, beyond the information included on employees' paychecks, Defendants did not provide employees with any further information regarding the provisions of section 203(m).  (ECF No. 137 at 47; Mould Aff. ¶ 16.)

The information included on Plaintiff's paychecks fails to meet the notice requirement of section 203(m).   In *Dorsey*, this Court found that an earnings statement that contained no reference to the federal minimum wage "could not *alone* have informed employees that their tipped wage was subminimum and that a certain percentage of their tips was being applied to meet federal minimum wage requirements."  888 F. Supp. 2d at 682; *see also Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 299-300 (6th Cir. 1998) (holding that an employer does satisfy the notice requirement where he informs employees of his intention to "use the tip credit against the minimum wage"); *Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1322 (1st Cir. 1992) (holding section 203(m) to "require at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations"); *Perez v. Prime Steak House Restaurant Corp.*, 939 F. Supp. 2d 132, 138-39 (D.P.R. 2013) (holding that an employer does not satisfy the notice requirement if he "makes no mention of minimum wage," as section 203(m) "requires, at a minimum, that the employer

inform the employee of its intention to use the tip credit towards satisfying the federal minimum wage requirements"); *Reich v. Chez Robert, Inc.*, 821 F. Supp. 967, 977 (D.N.J. 1993) (noting that an employer does not meet its obligation to "inform" under the FLSA when it tells its tipped employees that they will be paid a specific wage but does not explain that that wage is below the minimum wage and that it is permitted by law based on the employees' tips), *rev'd on other grounds*, 28 F.3d 401 (3d Cir. 1994).  Here, just as in *Dorsey*, Plaintiff's paychecks contained no reference to the federal minimum wage.  Therefore, they could not, *standing alone*, satisfy the notice requirement of section 203(m).

On the basis of the undisputed facts set forth by the parties, the Court therefore concludes that Defendants failed to comply with the notice requirement of section 203(m).

The Court now turns to the issue of whether Defendants also violated section 203(m) by implementing a tip-pooling policy that included employees other than "employees who customarily and regularly receive tips."  § 203(m).

In defining "employees who customarily and regularly receive tips," the Sixth Circuit has explained that if an employee "abstain[s] from any direct intercourse with diners, work[s] entirely outside the view of patrons, and solely perform[s] duties traditionally classified as food preparation or kitchen support work, they [cannot] be validly categorized as 'tipped employees' under section 203(m)."  *Myers v. Cooper Cellar Corp.*, 192 F.2d 546, 550 (6th Cir. 1999) (citing *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 300-302 (6th Cir. 1998)).  Similarly, in an opinion letter regarding tip sharing, the Department of Labor explained that:

> It is customary for waiters/waitresses to receive gratuities and share them with the busboys/busgirls who assist in serving the patrons.
> . . .
> The legislative history of the 1974 Amendments to the FLSA discusses tip pooling on page 43 of Senate Report 93-960.  It indicates that waiters, bellhops, waitresses, countermen, busboys, and service bartenders are among those who

may participate in a tip pool.  On the other hand, an employer will lose the benefit of the exception from the tip-retention requirement if tipped employees are required to share their tips with employees who do not customarily and regularly receive tips, such as janitors, dishwashers, chefs, or laundry room attendants.

1997 WL 998047 (DOL Wage-Hour Op. Letter). *But see Lentz v. Spanky's Restaurant II, Inc.*, 491 F. Supp. 2d 663, 670-671 (N.D. Tex. 2007) ("As noted in other courts, busboys do not necessarily interact directly with restaurant patrons . . .  because a busboy's duties normally do not come into play until the patrons have concluded their dining experience.  Nor does a busboy normally directly receive tips from customers or directly interact with them; yet, busboys are still considered as employees who customarily and regularly receive tips.")

In the case at bar, cooks, crab steamers, and prep cooks all participated in the tip pooling arrangement.[5]  (Corp. Designee Depo. at 24.)  The Court notes that prior to July 2012, some of the kitchen staff, referred to as "counter help," occasionally had contact with customers, in that customers would call ahead to enquire about the availability of certain kinds of crabs—particularly "sought after jumbo crabs"—and have kitchen staff place their desired crab selection on hold. (*Id.*, Levy Aff. ¶ 15.)  Further, sometimes kitchen staff would help out waiters and food runners in getting food to customers.  (ECF No. 137-4, Exhibit 2, "Clempner Depo." at 81.)  In sum, at best, *some* of the kitchen staff *occasionally* had *limited* contact with customers.  However, it is also clear that those cooks, crab steamers, and prep cooks who were not on "counter help" duty "abstained from any direct intercourse with diners, worked entirely outside the view of patrons, and solely performed duties traditionally classified as food preparation or kitchen support work, [and therefore] could not be validly categorized as 'tipped employees' under section 203(m)." *Myers v. Cooper Cellar Corp.*, 192 F.2d 546, 550 (6th Cir. 1999) (citing

---

[5] Plaintiffs have presented evidence that, as a manager, John Koelher was an employer under the FLSA and that therefore, his inclusion in the tip pool rendered it invalid.  However, the Court finds that it does not need to reach the issue of whether John Koehler was in fact an employer to find that the tip pool was invalid and therefore declines to do so.

*Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 300-302 (6th Cir. 1998)).  Thus, Defendants' tip pooling arrangement failed to satisfy the FLSA's requirement that it include only "employees who customarily and regularly receive tips."  § 203(m).

Of course, "[e]mployees may share tips with other workers who are not customarily and regularly tipped if they do so 'free from any coercion whatever and outside any formalized arrangement or as a condition of employment.'" *Roussell v. Brinker International, Inc.*. No. H-05-3733, 2008 WL 2714079 at *17 (S.D. Tex. July 9, 2008) (quoting DOL Field Operations Handbook § 30d04(c)).  However, it is an undisputed fact that Defendants provided servers with "recommended contributions" to the tip pool as part of their daily "revenue report."[6]  (Levy Affidavit ¶¶ 17-19).  Further, once money had been contributed, Defendant Levy would then decide how to apportion out the money in the tip pool.  (Levy Depo. at 76-78.)  On this basis, the Court concludes that the tip pooling arrangement was not "outside any formalized arrangement" and therefore is not exempt from compliance with the FLSA's requirements.  Accordingly, the Court grants Plaintiff's motion for summary judgment as to the issue of liability with regard to Counts I and IV and denies Defendants' motion for summary judgment as to the same.

The Court now turns to the issue of whether Defendants' violations of the FLSA—both with regard to the notice requirement and the tip-pooling arrangement—were willful.  Indeed, the statute of limitations under the FLSA is normally *two* years.  29 U.S.C. § 255(a).  However, where a defendant's violation was "willful," the plaintiff may recover for the preceding *three* years.  *Id.*

In order to find Defendants' conduct willful, the Court must find that they "either knew or showed reckless disregard for the matter of whether [their] conduct was prohibited by the

---

[6] There is a factual dispute between the parties with regard to whether or not these "recommended contributions" were, in fact, mandatory.  (*See, e.g.*, Mould Depo. at 150-51.)

[FLSA]." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

In an effort to elucidate the meaning of this standard, the Supreme Court explained that it did not want the issue of willfulness "to turn on whether the employer sought legal advice concerning its pay practices." *McLaughlin,* 486 U.S. at 134. As a result, an employer's violation of the FLSA is not willful if it is the result of a "completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects." *Id.* at 135. In sum, "if an employer acts unreasonably, but not recklessly, in determining its legal obligation, then" it is not acting "willfully." *Id.* at n.13.

The Court begins by addressing Defendants' violation of the notice requirement. As Plaintiff has presented no evidence that Defendants' conduct in this regard was knowing, the Court's task is to determine whether Defendants acted recklessly in determining their legal obligations or merely unreasonably.

Here, Defendants were aware that they could pay tipped employees less than the federal minimum wage of $7.25, but, allegedly, "did not understand that there [were] a number of preconditions for paying tipped employees $3.63/hour." (Levy Aff. ¶ 20 ("Prior to this lawsuit, I believed that the minimum wage for tipped employees was $3.63/hour.").) Defendants further allege that they assumed their "payroll processor would have advised [them] if there were any legal conditions that [needed to be satisfied] before paying $3.63/ hour to a tipped employee." (*Id.* at ¶ 22.)

The question of whether Defendants' failure to determine their legal obligations was unreasonable or reckless is a close one. The Court begins by noting that although Defendants provide that they "assumed" that their payroll processor would provide them with legal advice

concerning their pay practices, they have presented no evidence to support a finding that this was a reasonable assumption.  Indeed, to the contrary, in his deposition testimony, Defendant Levy provides that the payroll processor did little more than issue checks based on payroll information provided by Defendants' bookkeeper, Karen Wright.  (Levy Depo. at 75.) Defendants have presented no evidence that they had a reasonable expectation that their "payroll processor" would provide them with legal advice concerning their pay practices. Thus, the Court cannot find that Defendants sought legal advice concerning their pay practices.

Of course, the Court recognizes that an employer's violation of the FLSA is not willful merely because it failed to seek out legal advice.  What troubles the Court is that the subsection of the FLSA that allows employers to take a tip credit in determining the wages of tipped employees is the very same provision that requires employers who elect to take such a tip credit to inform employees of the provisions of the subsection.  § 203(m).  In fact, the two clauses are a mere three sentences apart.  Although Defendants may not have been familiar with the intricacies of federal minimum wage law, they were aware of the fact that they did not have to pay their tipped employees the full minimum wage of $7.25.  And yet, they were not aware of the FLSA's notice requirement.  Indeed, Defendants failed to provide Plaintiff with any meaningful notice that they were using his tip income to satisfy their federal minimum wage obligations.

Although bothered by Defendants' seemingly cavalier approach to the law, the Court cannot, ultimately, find that Defendants' conduct was reckless.  In availing themselves of the tip credit allowed by the FLSA but failing to determine whether any legal conditions needed to be satisfied prior to taking such a tip credit, Defendants' conduct was unreasonable but falls short of the recklessness required for the Court to find that their violation of section 203(m) was willful.

As a result the Court finds that Defendants' violation of section 203(m)'s notice requirement was not willful and therefore is subject to a two-year statute of limitations.  29 U.S.C. § 255(a).

The Court now turns to the question of whether Defendants' tip pooling violation was willful.  Contrary to the notice provision violation, Plaintiff has presented evidence that suggests that Defendants might have known that their tip-pooling arrangement violated the mandates of the FLSA.  Indeed, Plaintiff has alleged that "Defendants informed employees that they were not permitted to question the tip pool or they would be fired." (ECF No. 120-3 at 49.)  The evidence in support of this claim consists of statements by employees that they believed they would be fired if they questioned the tip pool.[7]  (ECF No. 120-5, Ex. 2, "Clempner Aff." ¶ 9 ("We were told by Rick Nagas not to question the tip pool or we would be fired."); ECF No. 120-7, Ex. 4, "Schlette Aff." ¶ 8 ("[T]he consensus amongst the staff was that if we did not contribute or we questioned the tip pool we would be fired.";  ECF No. 120-8, Ex. 5, "Lodowski Aff." ¶ 9 ("Rick Nagas told us that we could not question the tip out or we would be fired.  Rick said it was a sore spot with Albert Levy and we could not question or complain about having to tip out the kitchen.").)[8]  Although these statements certainly do not conclusively establish that Defendants knew that their conduct violated the FLSA, they nonetheless raise an issue of material fact in this regard.  Therefore, Defendants' motion for summary judgment as to willfulness is denied with

---

[7] Much of the evidence cited by Plaintiff (ECF No. 120-3 at 3) does not shed any light on whether Defendants threatened to fire employees if they questioned the tip pooling arrangement.  In his deposition testimony, Richard Nagas notes that the "tipout policy" was set by Defendant Levy and was mandatory.  However, he does not mention that if an employee complained about the tip pool they would be fired.  (ECF no. 120-12, Ex. 9, "Nagas Depo." at 25-26.)  Plaintiff, in his deposition testimony, provides that Defendant Levy threatened to fire him if he complained about the *tip income reporting policy* (i.e. the policy in which Defendants automatically reported 10% of cash bills as tip income) (Mould Depo at 110-111) and that participation in the tip pool was mandatory (*id.* at 121-123).  Neither of these show that Defendants either knew or showed reckless disregard for the matter of whether the tip-pooling arrangement violated the FLSA.

[8] Richard Nagas was the head server at the restaurant.  His responsibilities included hiring and firing staff, as well as scheduling.  (Nagas Depo. at 8.)

regard to the tip-pooling violation.   The determination of whether Defendants' tip-pooling violation was willful must be left for trial.

### 2.   Count II (MWHL violation—minimum wage)

The MWHL, like the FLSA, requires that an employer provide notice to an employee before claiming a tip credit as to the employee's wages.  Md. Code, Labor & Employment § 3-419(a)(1)(ii) ("This section applies to each employee who has been informed by the employer about the provisions of this section.").  Further, the language of the MWHL notice provision is nearly identical to that of the FLSA.  *Compare* 29 U.S.C. § 203(m) ("[The tip credit provision of the FLSA] shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection.") *with* Md. Code, Labor & Employment § 3-419(a)(1)(ii).  Given that the MWHL is the "state parallel" of the FLSA, the Court therefore concludes that Defendants also violated the MWHL by failing to give Plaintiff proper notice.  *Newell v. Runnels*, 967 A.2d 729, 771 (Md. 2009); *Gionfriddo v. Jackson Zink, LLC*, 769 F. Supp. 2d 880, 895 (D. Md. 2011) (noting the "congruent nature of the FLSA and MWHL").

Thus, the Court finds that summary judgment in favor of Plaintiff as to Count II is appropriate.  Accordingly, Plaintiff's motion for summary judgment as to Count II is granted and Defendants' motion for summary judgment as to the same is denied.

### 3.   Count III (MWPCL violation—unlawful deductions)

The MWPCL provides that an employee—or former employee—has a private cause of action where an employer has made an unlawful deduction from the employee's wages, provided that the deduction is not the "result of a bona fide dispute."  Md. Code, Labor & Employment, § 3-507.2(b).

As the Court has previously held, the MWPCL grants employees a private right of action where an employer fails to pay wages lawfully due.  (ECF No. 161 at 6.)  In particular, "[p]aying an employee less than minimum wage, in violation of the FLSA and MWHL, constitutes such an unlawful deduction."  (*Id.* at 7.)  Here, as the Court has established above with regard to Counts I, II, and IV, Defendants failed to comply with the notice requirements of the FLSA and the MWHL.  As a result, Defendants were not entitled to take a tip credit in order to meet their minimum wage obligations.  Therefore, "Plaintiff's wage of $3.63 an hour [(Mould Depo. at 162)] was below minimum wage; and . . . thus Defendants made an unlawful deduction from Plaintiff's lawful wages." (*Id.* at 11.)

Defendants have moved for summary judgment as to Count III on the basis that "no reasonable jury could find an absence of a bona fide dispute as to Mould's wage claims."[9]  (ECF No. 169 at 3.)  At issue, therefore, is whether Defendants' failure to pay Plaintiff a full minimum wage was the "result of a bona fide dispute."

As the Maryland Court of Appeals has explained, a "bona fide dispute" exists where there is a "legitimate dispute over the validity of the claim. . . ."  *Admiral Mortgage, Inc. v. Cooper*, 745 A.2d 1026, 1031 (2000).  Here, the Court finds that there can be no legitimate dispute that Defendants failed to satisfy the notice requirement of section 203(m) of the FLSA and section 3-419(a) of the MWHL.  Indeed, as this Court has explained above, Defendants failed to provide Plaintiff with any meaningful notice that they were using his tip income to satisfy their federal minimum wage obligations.  As a result, there can be no legitimate dispute that Defendants were not entitled to take a tip credit and that Plaintiff was owed the full

---

[9] While Plaintiff opposes Defendants' motion for summary judgment, he has not, himself, moved for summary judgment as to Count III.  (ECF No. 172 at 14.)

minimum wage.   Accordingly, Defendants' motion for summary judgment as to Count III is denied.

### 4.   Liability of Defendant Nolen Graves

Defendant Nolen Graves argues that he is entitled to summary judgment as to Counts I, II, and IV because he is not an employer covered by the FLSA or the MWHL's proscriptions on failure to pay minimum wage and failure to compensate for overtime.

The FLSA treats as an employer "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The FLSA's provisions "should be broadly interpreted and applied to effectuate its goals," *Purdham v. Fairfax Co. Sch. Bd.,* 637 F.3d 421, 427 (4th Cir. 2011), which includes the intent "to lessen, so far as seemed then practicable, the distribution in commerce of goods produced under subnormal labor conditions" by eliminating low wages and long hours, *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 727 (1947).  However, courts must also respect the corporate form, and an officer of a corporation is not necessarily an employer for FLSA purposes.  *Caseres v. S & K Mgmt Co.*, No. AW-12-1358, 2012 WL 525061 at *3 (D. Md. Oct. 24, 2012).  The test of whether a person is an employer therefore depends on the "economic reality" of that individual's status in the workplace. *Gionfriddo v. Jason Zink,* LLC, 769 F. Supp. 2d 880, 890 (D. Md. 2011). As this Court has previously explained,

> [a] consistent factor in cases from other circuits has been operational control over the individuals claiming to have been employees. The Second Circuit has noted the relevant factors to consider include "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir.1999). That court also observed that none of the four factors is dispositive and that a court should consider the totality of circumstances. *Id.* However, the *Herman* opinion further noted that it is not

necessary to employer status to monitor employees continuously. Instead,
"[c]ontrol may be restricted, or exercised only occasionally." *Id.*

*Speert v. Proficio Mortgage Ventures, LLC*, Civ No. JKB-10-718, 2011 WL 2417133 at \*3 (D.

Md. June 11, 2011); *see also Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 413 (D. Md.

2013). This "economic reality" test also determines whether a person is an employer pursuant to

the MWHL. *Newell v. Runnels*, 967 A.2d 729, 770 (Md. 2009).

Here, it is an undisputed fact that Defendant Graves is the owner, sole-shareholder, and

president of NJG Food Service, Inc., as well as the sole member of OC Crabbag, LLC. (Corp.

Designee Depo. at 236.) Further, Defendant Graves has some involvement in the operation of

the restaurant. On a weekly basis, he peruses the restaurant's finances and also monitors the

restaurant through a direct video feed that he watches from his home or office computer. (*Id.* at

236, 244-45.) In addition, Defendant Graves and Defendant Levy discuss "all kinds of things"

pertaining to the restaurant, "down to the chicken recipe," on a daily basis. (Levy Depo. at 149-

150). Finally, Defendant Graves hired Defendant Levy. (Corp. Designee Depo. at 236.)

However, when asked whether Graves was involved in hiring decisions at the Crab Bag,

Richard Nagas, the head waiter, responded: "Not really. Nolen was more of a . . . customer . . . .

I never really saw Nolen really involved in the restaurant business . . . . I never went to him

about restaurant decisions about anything. It was always Albert [Levy]. [Nolen Graves] was

more the guy on the side. . . ." (Nagas Depo. at 54.) Further, as Plaintiff has conceded, Graves

neither hired nor fired him. (Mould Depo. at 380.)

Nonetheless, before sending an email to Plaintiff informing him that he was terminated,

Defendant Levy forwarded the email to Defendant Graves with the subject line "I am sending

this to Jeff." (ECF No. 120-38.) Mr. Levy's email to Mr. Graves was sent at 2:28 PM on June

27, 2013. At 3:32 PM that same day, Mr. Levy sent Plaintiff an email informing him of his

termination.  (ECF No. 120-29.)  In addition, in his deposition testimony, when asked whether he discussed Plaintiff's termination with Defendant Graves, Defendant Levy gave the following equivocal answer:

> Q. Before you terminated Mr. Mould, did you talk about it with Mr. Graves?
> A. Talk about what?
> Q. Terminating Mr. Mould.
> A. Sir, the only conversation was, was that Jeff [Mould] is going to be coming in to talk to me.  That's the conversation.
> Q. You talked to Mr. Graves about that.
> A. I talked to—I mean, I talk to him every day.  I talk to him about all kinds of things.

(Levy Depo. at 150.)

In sum, the Court finds that there is an issue of material fact as to the exact nature of Defendant Graves's status at the Crab Bag.  In particular, based on the email communication between Mr. Levy and Mr. Graves regarding Plaintiff's termination notice, the Court finds that it can draw a reasonable inference that Defendant Graves was involved in the decision to terminate Plaintiff.[10]  Accordingly, Defendants' motion for summary judgment regarding the issue of Defendant Graves's personal liability as an "employer" under the FLSA and MWHL is denied.

### 5.  Count VII (IRC claim)

In Count VII Plaintiff alleges that Defendants willfully filed a fraudulent W-2 form with regard to Plaintiff's 2012 income, in violation of 26 U.S.C. § 7434(a).  Specifically, Plaintiff alleges that "Defendants willfully and fraudulent[ly] over-reported tips earned by Plaintiff on his 2012 W2 by approximately $10,000."  (Am. Compl. ¶ 53.)

The Internal Revenue Code provides that:

> If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return.

---

[10] Given that the Court is ruling on Defendants' motion for summary judgment, it must draw all reasonable inferences in favor of Plaintiff.  *Rossignol,* 316 F.3d at 523.

§ 7434(a).

As other courts have noted "[o]ur task in interpreting the meaning of § 7434 'begins where all such inquiries must begin: with the language of the statute itself.'" *Katzman v. Essex Waterfront Owners, LLC*, 660 F.3d 565, 568 (2d Cir. 2011) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).   Further, "'[i]n this case it is also where the inquiry should end, for where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'" *Id.*  (internal quotation marks omitted).

In the tax context, fraud requires "intentional wrongdoing" and an "intent to deceive." *Vandehee v. Vechio*, 541 F. App'x. 577 (6th Cir. 2013) (unpublished); *Zell v. C.I.R.*, 763 F.2d 1139, 1143-44 (10th Cir. 1985).   *See also Maciel v. Comm'r*, 489 F.3d 1018, 1026 (9th Cir. 2007); *Granado v. Comm'r*, 792 F.2d 81, 93 (7th Cir. 1986) (per curiam).   Here, the undisputed facts establish that any mistake in Plaintiff's 2012 W-2 form was not the result of any such "intentional wrongdoing" or "intent to deceive."

Starting on December 9, 2011, Defendants put in place a new policy for calculating employees' tipped income.   (ECF No. 120-21.)   Under this policy, Defendants approximated employees' income from tips as 10% of cash sales (i.e. checks that customers paid with cash) and 100% of tips paid by credit card.   (*Id.*)   This policy was clearly explained to all employees, including Plaintiff. (Mould Depo. at 99.)

Plaintiff asserts that this policy overstated his income for two reasons.   First, the policy did not take into account amounts of money that were contributed to the tip pool.   (Mould Aff.  ¶ 21.)   Second, when a customer left no tip on a credit card sale, the sale was treated as a cash sale. (*Id.*)   As a result, Defendants automatically reported 10% of the sale as tip income, even where employees did not actually receive a tip.   (*Id.*)   While Plaintiff's statements support the

conclusion that the tip income reported on his 2012 W-2 form was erroneous, they do not

establish that Defendants' mistake was the result of any "intentional wrongdoing" or "intent to

deceive."

In an effort to show that the information return was in fact "fraudulent," Plaintiff relies on

two evidentiary sources.  First, he relies on the expert testimony of Larry Epstein, who stated:

"I'm not making any type of accusation.  But if you overstate the W2 of one person, you *could*

be understating a W2 of another person, or you *could* be putting it into somebody else's W2

earnings that somebody is taking.  And, again, I'm not saying that occurred here."  (*Id.*; ECF No.

120-18, Ex. 15, "Epstein Dep." at 117 (emphasis added).)  Second, he relies on the fact that the

United States has a tax lien against Defendant Levy's property for $266,375.17 in unpaid taxes.

(*Id.*; ECF No. 120-40.)  On this basis, Plaintiff argues that "Defendant Levy has a very good

reason to over-report employee wages."  (ECF No. 120-3.)  Ultimately, however, these facts and

the inferences to be drawn therefrom, even when viewed in the light most favorable to Plaintiff,

are insufficient to create an issue of material fact as to whether Defendants filed a "fraudulent"

W-2 form.

In contrast, Defendants have produced evidence that the December 9, 2011 policy was

implemented to ensure that tip income was properly reported to the IRS.  (Levy Dep. at 58.)  In

fact, Defendants' practice here resembles the "aggregate estimation method" that the IRS

sometimes uses to estimate restaurant employees' tip income when it conducts audits.  *See*

*United States v. Fior D'Italia, Inc.*, 536 U.S. 238 (2002).  Prior to implementing this policy,

Defendants had experimented with other policies that depended on waiters accurately reporting

tips.  (Levy Dep. at 60-61.)  However, Defendants found that under these other policies

employees failed to report their tips accurately.  (*Id.* 61:19-22.)  These facts establish that

although Defendants may have issued an erroneous W-2 form, they did not do so as a result of "intentional wrongdoing" or with the "intent to deceive."

Ultimately, therefore, the Court finds that Defendants have met their burden of showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law with regard to Count VII.  Accordingly, Defendants' motion for summary judgment as to Count VII is granted.

### 6.  Count X (FLSA retaliation claim)

In Count X, Plaintiff claims that his indefinite suspension, on June 23, 2013, and subsequent termination, on June 27, 2013, violated the anti-retaliation provision of the FLSA.  29 U.S.C. § 215(a)(3) ("It shall be unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter. . . .").  The framework for proving retaliation under the FLSA is the same *McDonell Douglas* scheme as is used in Title VII cases.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008); *Lettieri v. Equant, Inc.,* 478 F.3d 640, 649 (4th Cir. 2007); 1 Ellen C. Kearns, *The Fair Labor Standards Act* 15-39 (2d ed. 2010).  Specifically, a plaintiff must first make a prima facie case of retaliation by showing that:

> (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to . . . such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action.

*Darveau*, 515 F.3d at 340.  With regard to the third element, "[n]ormally, very little evidence of a causal connection is required to establish a *prima facie* case."  *Jackson v. Mayor and City Council of Baltimore City*, No. JFM-08-3103, 2009 WL 2060073 at *7 (D. Md. July 14, 2009) (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998), *overruled on*

*other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).  Specifically, mere temporal proximity between the protected activity and the adverse employment action is sufficient to establish a *prima facie* causal connection.  *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (noting that the Fourth Circuit, in an earlier case, had found a four-month period in between protected activity and adverse employment action to constitute a causal nexus.)[11]

Here, the Court finds that Plaintiff has successfully established a *prima facie* case. Indeed, on May 1, 2013, Plaintiff filed a complaint against Defendants for violating the FLSA. (ECF No. 1).  On June 23, 2013, Plaintiff was suspended (*see* Mould Depo. at 303-04; Levy Dep. at 214-15), and, four days later, on June 27, Plaintiff was terminated  (*see* ECF No. 120-29).  Given the temporal proximity between the filing of his complaint and his termination, Plaintiff has established a *prima facie* case of retaliation.

Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff has stated a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action.  *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002). Here, Defendants have explained that Plaintiff was fired for sexually harassing Taylor Roes (formerly Taylor Lynch), who was a fellow employee.  (Levy Aff. ¶¶ 16-17.)  Specifically, Defendant Levy has explained that on June 7, 2013, he witnessed an interaction at the restaurant's hostess station between Plaintiff and Ms. Roes that led him to believe something "not right" might have been afoot.  (Levy Depo. at 104-106.)  Later, Mr. Levy talked to Ms.

---

[11] In light of the Supreme Court opinions in *Gross v. FBL Financial Services, Inc.* and *University of Texas Southwestern Medical Center v. Nassar*, the Court interprets section 15(a)(3) of the FLSA as requiring a plaintiff in an FLSA retaliation case to prove, ultimately, that the plaintiff's protected activity was the "but-for" cause of the challenged adverse action.  557 U.S. 167 (2009) (holding that in a disparate treatment action brought under the Age Discrimination in Employment Act ("ADEA"), a plaintiff must prove by a preponderance of the evidence that age was the 'but-for' cause of the challenged employement decision); 133 S.Ct. 2517 (2013) (finding no meaningful difference between the texts of the retaliation provision of Title VII and the ADEA and holding, therefore, that Title VII retaliation claims, like claims brought under the ADEA, require "but-for" causation; *see also* 1 Ellen C. Kearns, *The Fair Labor Standards Act* 15-43 to 15-45 (2d ed. 2010).

Roes who indicated that Plaintiff made her "feel uncomfortable." (*Id.* 121.)  On June 23, 2013, Plaintiff Levy called Ms. Roes into his office to enquire if there were any further problems with Plaintiff.  (*Id.* 128.)  She reported that she still felt uncomfortable and, at Defendant Levy's request, made a written statement to that effect.  (*Id.* at 127; ECF No. 104-10, Ex. 7, "Lynch Statement.")  Defendant Levy then suspended Plaintiff and began asking other employees about Plaintiff's behavior.  (Levy Depo. at 127.)  As part of his investigation, Defendant Levy collected statements from a number of other employees who confirmed Plaintiff's inappropriate workplace behavior.  (ECF Nos. 104-11, -12, -13, -14, -15.)  The Court thus finds that Defendants have satisfied their burden of articulating a legitimate, non-retaliatory reason for Plaintiff's termination.

Under the *McDonnell Douglas* burden-shifting framework, the burden now shifts back to Plaintiff to show that the proffered reason was not the employer's true reason but, rather, was merely a pretext for unlawful retaliation.  *Anderson*, 281 F.3d at 458.  For example, a plaintiff might establish pretext by showing that similarly situated employees were treated differently or that he was "singled out."  *See* Kearns, *The Fair Labor Standards Act* 15-43 (collecting cases).

Here, Plaintiff argues that he "came under increased scrutiny when he filed his lawsuit" and that he was singled-out in a "workplace [that] was a sexually loose environment where management participated in the 'unprofessional' environment that Levy decries." (ECF No. 120-3 at 31.)  This argument partly misses the mark.  In particular, when Plaintiff alleges (1) that the Crab Bag was a "sexually loose environment" in which Defendants, including Mr. Levy himself, "participated in sexual jokes and other banter with the employees" and (2) that the Crab Bag had no sexual harassment policy, his arguments are inapposite to the issue of pretext.  (*Id.*)  Indeed, Defendants do not say they terminated Plaintiff for his sexual jokes or banter.  Rather, the

proffered reason for termination is that (1) Plaintiff sexually harassed another employee, Ms. Roes, (2) Ms. Roes complained to management about Plaintiff, and (3) other employees corroborated Ms. Roes's account.   Therefore, Plaintiff's arguments about the "sexually loose environment" at the Crab Bag, even if supported by admissible evidence (a question that the Court declines to reach), are irrelevant to the issue of pretext.

Plaintiff comes closer to the mark when he argues that "on at least two occasions, female servers complained to management about conduct by male employees . . ." but that no disciplinary action was taken by management.  (*Id.* at 33;  Mould Aff. ¶ 15; ECF No. 120-6, Ex. 3, "Lodowski Aff." ¶¶ 5-6; ECF No. 120-7, Ex. 4, "Schlette Aff." ¶ 6; ECF No. 120-8, Ex. 5, "Yanek Aff." ¶ 8.)  However, Plaintiff has failed to present admissible evidence that supports his claim. Indeed, in their affidavits, Ms. Schlette and Ms. Yanek do not mention that management was aware of any employee misconduct.  (Schlette Aff.; Yanek Aff.)  Further, in her affidavit, Ms. Lodowski provides that Alyssa Fowler complained to management about the behavior of Charles Sheubrooks, but such a statement is inadmissible hearsay.  (Lodowski Aff. ¶ 6.) Similarly, Plaintiff, in his affidavit, provides that Amy Velli complained to Defendant Levy that Brian Chetelat, who was the Crab Bag's general manager at the time, made sexual advances toward her and that no action was taken.  (Mould Aff. ¶ 15.)  Again, however, this constitutes inadmissible hearsay.

Plaintiff has also testified that he "knows that Alyssa Fowler, a former server, complained to Brian Chetelat about Charles Sheubrooks . . . grabbing her buttucks [*sic*]" and that "nothing was done."  (*Id.*)  Plaintiff goes on to recount that "when Alyssa tried to come back to the restaurant to serve the next  summer Richard Nagas and John Koehler told [him] that they did not want to hire her back because of the incident with [Sheubrooks] and because [Sheubrooks's]

girlfriend would be working there and they did not want to cause trouble." (*Id.*)  The first part of this statement (i.e., that Ms. Fowler complained to Mr. Chetelat about Mr. Sheubrooks's sexual harassment) constitutes inadmissible hearsay in that Plaintiff fails to provide the Court with the basis for his "knowledge" that Ms. Fowler complained to Mr. Chetelat.  The remainder of the statement (i.e., that Mr. Nagas and Mr. Koehler did not want to hire Ms. Fowler back because of Mr. Sheubrooks), standing on its own, fails to show that Plaintiff was treated differently than similarly situated employees.  Indeed, because the content of Ms. Fowler's complaint to Mr. Chetelat is inadmissible hearsay, the Court cannot infer that Mr. Sheubrooks was similarly situated to Plaintiff.

In contrast, Defendants have presented evidence that they did, in fact, discipline employees who sexually harassed co-workers.  A month before Plaintiff filed this lawsuit, Defendant Levy terminated an employee, Tom Belyea, when he learned that Mr. Belyea had sexually harassed another employee.  (ECF No. 138.)  In addition, after this lawsuit was filed, but before Plaintiff was suspended, Defendant Levy terminated another employee, Kyle Kesterson, after receiving sexual harassment complaints from a server.  (ECF No. 138-1.)

Plaintiff next argues that "[t]he statements of the witnesses that Levy solicited on the day after Mould was suspended[, as well as the statement by Ms. Roes,] are [untruthful and] colored by the fact that most of them are individuals who received something from The Crab Bag around the time of the statements."  (ECF No. 120-3 at 12-13; Mould Depo. 286-303.)  However, again, Plaintiff fails to offer admissible proof that would tend to show that Defendants knew that the statements were false.  In support of this theory, Plaintiff has produced a document that is purportedly a receipt for a payroll advance of $500 to Mr. Sheubrooks, dated June 11, 2013. (ECF No. 123-1.)  However, this document is not authenticated, and, even if it were, Plaintiff has

provided no evidence to support the inference that this payment was made by Defendants as an inducement for Mr. Sheubrooks to provide a false statement regarding Plaintiff's conduct. Plaintiff also points to the fact that between June 14 and June 23, Ms. Roes was promoted from hostess to server.  (ECF No. 120-14, Ex. 11, "Roes Depo." 47-49.)  However, again, Plaintiff has provided no evidence that this promotion was made by Defendants as an inducement for Ms. Roes to provide a false statement regarding Mr. Mould's conduct.

Finally, Plaintiff suggests that "Defendants' retaliatory intent is further laid bare by the fact that the general manager, John Koehler, admitted to [Peter] Clempner[, a server at the Crab Bag,] that [Clempner] was denied the promotion to head server because he was assisting Mould in the lawsuit."  (ECF No. 120-3 at 24.)  Specifically, Clempner testified that "John [Koehler] told me that they[, i.e. Graves and Levy,] didn't want to promote me because Jeff and I were good friends and they thought I was part of the lawsuit as well." (Clempner Aff. ¶ 6.)  However, this evidence does not show that Defendants retaliated against *Plaintiff*.

Therefore, the Court finds that Plaintiff has failed to raise an issue of material fact to show that the proffered reason was not the employer's true reason but, rather, was merely a pretext for unlawful retaliation.  *Anderson*, 281 F.3d at 458.  Accordingly, Defendants' motion for summary judgment as to Count X is granted.

## IV.    CONCLUSION

For the above reasons, Defendants' cross-motion for summary judgment (ECF No. 104) and supplemental motion for summary judgment (ECF No. 169) are GRANTED IN PART and DENIED IN PART; Plaintiff's motion for partial summary judgment (ECF No. 120) is GRANTED IN PART and DENIED IN PART; and Defendants' motion to strike (ECF No. 136) is GRANTED IN PART AND DENIED IN PART.

Specifically, with regard to:

- Counts I and IV: Plaintiff's motion for summary judgment as to the issue of liability is GRANTED.   Defendants' motion for summary judgment as to the same is DENIED.   Further, Defendants' motion for summary judgment as to the issue of willfulness is DENIED.   Therefore, the issue of whether a two-year or three-year statute of limitations will apply to Counts I and IV is one that will have to be decided at trial.

- Count II: Plaintiff's motion for summary judgment as to the issue of liability is GRANTED.  Defendants' motion for summary judgment as to the same is DENIED.

- Count III: Defendants' motion for summary judgment is DENIED.   Count III will have to be adjudicated at trial.

- Count VII: Defendants' motion for summary judgment is GRANTED.   Judgment shall be entered for the Defendants.

- Count X: Defendants' motion for summary judgment is GRANTED.  Judgment shall be entered for the Defendants.

Finally, Defendants' motion for summary judgment as to the personal liability of Defendant Graves with regard to Counts I, II, and IV is DENIED.  The issue is one that will have to be decided at trial.  A separate order follows.

Dated this 12th day of August, 2014.

BY THE COURT:

_____/s/_____

James K. Bredar
United States District Judge